IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

NATHAN DALE MCNAUGHTON,

                Plaintiff,                        OPINION AND ORDER

v.

                                                    22-cv-247-wmc

SCHOOL DISTRICT OF AMERY,

                Defendant.

---

*Pro se* plaintiff Nathan McNaughton filed this civil lawsuit against his former employer, defendant School District of Amery. McNaughton was employed by the District as a fifth-grade teacher for the 2020-2021 school year, during which he asserts it violated his rights under the Family and Medical Care Leave Act ("FMLA"), the Americans with Disabilities Act ("ADA") and the Health Information Portability and Accountability Act ("HIPAA"). Now before the court is the District's motion for summary judgment. (Dkt. #12.) Because the evidence of record does not support a claim under any of these statutes, the court will grant defendant's motion and direct entry of final judgment in its favor.

UNDISPUTED FACTS[1]

**A. McNaughton's hiring and performance**

On or around August 24, 2020, McNaughton began work as a fifth-grade teacher at Amery Intermediate School for the upcoming school year. McNaughton's supervisor was the principal of the Intermediate School, Oralee Schock. During the hiring process,

---

[1] Unless otherwise indicated, the following facts are material and undisputed. The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying, record evidence as appropriate.

McNaughton did not disclose that he had sustained a concussion in 2017 or 2018. However, McNaughton testified at his deposition that during a school tour he informed Principal Schock that he had memory and organizational issues from a concussion. (McNaughton Dep. (dkt. #14 ) 16.) Even then, McNaughton acknowledged that he did not tell Schock that these issues might interfere with his ability to meet the reasonable expectations of a fifth-grade teacher, nor does he attest to alerting anyone else in the District of his issues. McNaughton also testified that during in-servicing he told Schock that he has an attention deficit disorder and asked permission to keep an emergency dose of his medication at the school, to which Schock merely shrugged in response. (*Id.* at 18.)

The expectations for McNaughton's position included: demonstrating high quality instruction for all students; preparing for classes and showing written evidence of preparation; using a variety of instructional techniques and instructional media consistent with physical limitations of the location and the needs and capabilities of the individuals or students; guiding the learning process toward curriculum goals; establishing objectives for lessons, units and projects; and maintaining accurate and complete records as required by state statute, district policy and administrative guidelines. In considering those requirements, McNaughton stated on his own September 25, 2020, self-evaluation form that he wanted to participate more in the professional community by asking for help and accessing services, and wanted improve the organization of his instruction, the classroom environment and student involvement in lessons. Principal Schock reacted to this self-review by commenting that: behavior should not prevent a class from meeting individual needs of every student; classroom organization is very important; fifth-grade students can

help maintain a neat and orderly classroom; beginning lessons with the question of "why" leads to active participation; and that McNaughton should hold all students accountable for participating in lessons.

During the ongoing school year, Principal Schock subsequently observed McNaughton's classroom and completed mini-observation checklists, noting multiple performance problems. For example, Schock observed McNaughton teach a lesson on October 13, 2020, and noted that the students did not know where to sit, prompting her to ask McNaughton if the students had assigned seats. On November 5, Schock again observed McNaughton's classroom, noting that he was texting on his cell phone in front of students when she entered the classroom and that his level of rigor involved "1-2 mostly rote answers." (Dkt. #14-1, at 10-11.) At that time, Schock directed McNaughton: "Please make sure you are using your cell phone in private. We would not want our students going home and telling their parents that their teacher is texting on his cell phone during class time." (*Id.* at 9.)

Schock then began keeping notes of her meetings with McNaughton about his performance. Then, between November 6 and 9, 2020, McNaughton was home due to a COVID quarantine, and when he returned to work on November 10, Schock met with McNaughton about his performance. In particular, Schock noted that McNaughton failed to provide lesson plans for his substitute teacher, and that his instructional materials were not left in a usable manner for the substitute. Schock also noted that McNaughton's desk was a disaster, including a pile of corrected papers within student view, overfull student mailboxes, and a disorganized student laptop/headset station. Further, Schock stated that

what she had observed on November 5 was not acceptable, and that he must take measures immediately to resolve the concerns or he would be subject to a letter of reprimand.

Although McNaughton did not ask Schock for anything that might help his job performance at that time, Schock developed a performance improvement plan for McNaughton, which included objectives for improvement in curriculum, instruction, training and organization.  McNaughton was to:  take the initiative to work with his fifth grade co-workers to create a unified curriculum that fosters growth and development in reading, math, social studies and science; deliver instruction in a professional demeanor, limit "bird-walking or personal health conversations" and listen and actively participate in grade-level meetings; follow the agreed-upon pacing guides; complete the required technology and instructional training; schedule a monthly meeting with Schock to review his improvement plan; keep his classroom neat, clean and organized; *and* teach students the skills necessary to keep the classroom clean and organized.  Schock attests that she included the specific comment about discussing personal health issues because she personally observed McNaughton lose focus and go off-topic, referencing injuries from sports games.  Schock and McNaughton also discussed the improvement plan during a meeting.

Schock continued to notice performance issues with McNaughton.  On November 23, Schock observed McNaughton teach a lesson from his classroom to his students, who were learning from their homes via laptop.  Among other things, Schock observed that McNaughton had not put the article he intended for the students to read during the lesson into the Google classroom, and that the questions and rigor were "low-level."  Schock also

4

noted that McNaughton had trouble writing a word on the whiteboard, then told his students that he has had a "hard time spelling after he had his last concussion." (Ex. 14 (dkt. #14-1) at 16.) Similarly, on January 12, 2021, Schock observed McNaughton teach a lesson and later noted that: the schedule from the prior day was still on the whiteboard; students did not know their small groups; the lesson's rigor remained low-level; the learner outcomes did not apply to the lesson; there was little engagement between group members; and the students lacked direction.

Schock discussed these observations with McNaughton in a meeting on January 18, during which she raised multiple concerns with McNaughton, including that: the daily schedule must be current and reviewed with the students; she observed students falling behind; and she was concerned about his "preparedness for daily lessons." Schock also gave McNaughton some improvement advice. At that point, McNaughton then shared with Schock that he was seeking medical advice due to concerns about his memory loss from a prior concussion.

### B. McNaughton's absences and diagnosis

According to McNaughton, his wife also began noting on January 12 that he was experiencing tremors and migraines, which she did not notice because he had previously been able to hide them. On February 3, McNaughton shared with Schock that a CT scan showed a spot on his brain from a past concussion, and also that a doctor gave him medication to treat tremors. During that same meeting with Schock, McNaughton advised that he had upcoming medical appointments, but did not ask Schock for any help with his job performance.

5

On February 8, 2021, two of McNaughton's students told Schock that McNaughton had shaky hands and fell against the whiteboard, prompting Schock to speak with McNaughton again. At that time, he told Schock that sometimes he gets "lightheaded," and that his wife was concerned about his health and did not want him to be left home alone or to drive with his kids. Schock then brought McNaughton to speak with the District's Director of Personnel, Twila Sikkink. During that meeting, Schock asked McNaughton to obtain a doctor's referral confirming that he was physically fit. Schock also asked McNaughton to go home and contact her once he received answers from his doctor, and to return to work after his doctor confirmed that he was able to do so. Finally, Sikkink provided McNaughton two forms that he would need to complete and submit for short-term disability benefits if he ran out of sick days before returning to work. However, Sikkink did not give McNaughton FMLA paperwork at that meeting.

After that meeting, McNaughton was medically unable to return to work. Indeed, on February 10, 2021, McNaughton emailed Schock that: his doctor did not feel it was safe for him to return to work; he had "the disability paperwork"; and he would send it to Sikkink the next day. That same day, McNaughton's primary care physician, Dr. John Hokanson, completed a form indicating McNaughton's primary diagnosis as "Mild/Moderate Cognitive Decline." Dr. Hokanson wrote that McNaughton's first symptoms appeared on January 12, 2021, and he became unable to work due to his medical impairment on February 8, 2021. Dr. Hokanson also could not determine the date that McNaughton could return to work because his condition had an "[u]nknown cause, diagnosis and course." (Dkt. #14-4, at 1.)

6

On February 13, 2021, McNaughton's wife also completed an employee's statement form for purposes of short-term disability benefits. She reported that his symptoms first appeared on January 12, and that he planned to return to work when his symptoms improved, but that the cause of his symptoms was still unknown. On February 15, Schock also followed up with McNaughton directly because she had not received paperwork from his doctor allowing him to be absent from work, and she did not know when he would be returning. Schock also emailed him FMLA paperwork, attaching an FMLA form entitled, "School District of Amery Employee Request for Family and Medical Leave." However, the District never received a completed FMLA Request from McNaughton.

Schock also learned on February 13 that McNaughton had not prepared for parent-teacher conferences, and that McNaughton's substitute teacher and a custodian had found ungraded student papers in cleaning his classroom. Schock further confirmed that McNaughton had not entered any grades into the school's electronic program.

On February 16, McNaughton sent an email to Sikkink with the subject line, "Short Term Disability," to which he attached his completed short-term disability paperwork. By February 18, McNaughton had also exhausted his paid sick leave. Still, he was allowed to be off work on unpaid leave due to his medical condition. On February 22, McNaughton further emailed Schock that he had been admitted to the hospital for treatments for blacking out and dizziness, and he would provide Schock an update when he had answers. McNaughton separately emailed Sikkink for a HIPAA form as well after Schock had told him that the school may need to access his medical records to assist with his short-term disability claim.

7

On February 26, 2021, McNaughton met with Schock and the District's Administrator, Dr. Shawn Doerfler. McNaughton reported that he had been diagnosed with tachycardia, a rapid heartbeat that is out of proportion to age and activity, and that a neuropsych evaluation had been ordered for him. On March 22, Schock next called McNaughton because she knew that he had a doctor's appointment on March 15, but had not heard from him. McNaughton then emailed Sikkink, asking if he needed to fill out or update his disability paperwork, and when he expected McNaughton would get a payment from the short-term disability insurance company. In response, Sikkink provided him contact information for a representative from the short-term disability company.

On March 28, McNaughton emailed Schock, attaching a letter from Dr. Hokanson, who wrote that McNaughton received care on March 24, and that his "acute cognitive decline has still not improved to the point where he can go safely to work. His next review with neurology will be on 4/19/21." (Dkt. #16-4, at 2.) In response to Schock's request that he authorize the release of medical records, McNaughton also wrote: "To be honest, I do not feel comfortable releasing access to my medical records. I should have an answer from a lawyer early this week." (*Id.* at 1.) As a result, the District did not receive correspondence or information from McNaughton's physician besides this single, late March letter. Moreover, McNaughton never signed any documents giving the District access to his medical records for the period from February through April of 2021.

C  **McNaughton's Release and Resignation**

The 2021-2022 expected enrollment at Amery Intermediate School was lower than anticipated, which required a workforce reduction by one teacher. Schock recommended

8

that the best course of action was to move a third-grade teacher to the fifth grade for the next school year, and then bring him back to third grade the following year. Since this required the District to reduce the fifth-grade teacher workforce by one teacher, Schock and Doerfler selected McNaughton for possible non-renewal, noting that he was incapable of adequately performing his job.

On March 31, 2021, McNaughton spoke with Schock and Doerfler over the phone, prompting them to tell McNaughton that the District was pursuing non-renewal of his contract. That same day, the School District of Amery Board of Education mailed McNaughton a preliminary notice of intent to non-renew. That letter cited three reasons: (1) enrollment was declining the next school year; (2) Schock had noted performance issues in the 2020-2021 school year; and (3) McNaughton did not have the ability to be physically present with the students to instruct them. The letter also advised McNaughton that he could request a private conference with the school board. In response, McNaughton requested a private conference, and on April 5 and 6, Dr. Doerfler acknowledged McNaughton's request and notified him of the date of his private conference with the school board. On April 9, Doerfler also notified McNaughton that he could have legal representation at his private conference.

On April 13, McNaughton and District Administrator Doerfler spoke over the phone. Doerfler advised McNaughton that if the school board declined to renew his contract, he would need to disclose that fact on future teaching applications in the State of Wisconsin. Doerfler also told McNaughton that the School District would accurately respond to questions from any prospective employer about McNaughton's employment.

9

Finally, Doerfler told McNaughton that while he had the option to resign, he believed the District School Board would not renew his contract.

At that time, McNaughton retained Attorney Kathleen Avoles, although he testified during his deposition that he has no memory of their conversations. (*See* McNaughton Dep. (dkt. #14) 75-82.) Attorney Steve Weld represented the District with respect to McNaughton's employment. Attorney Avoles received a letter from Attorney Weld about the guidelines for the upcoming April 19 private conference. In response, Avoles wrote that McNaughton would agree to resign his employment and forego the meeting *if* the District was willing to continue his health benefits through the end of the year and allow him to apply in the District when his medical condition was under better control. The two attorneys communicated further about the terms of his resignation, and on April 18, 2021, Weld sent Avoles a document with the terms of a mutually agreeable resignation, which included that: McNaughton would resign, but continue to receive short-term and long-term disability benefits that he qualified for through the end of his contract year; the District would still contribute to McNaughton's health insurance premiums through June 2021; the District would provide a letter of reference for him; and McNaughton could apply for future vacant positions in the District. That agreement was finalized and executed on April 19, but McNaughton again has no memory of speaking with Avoles about the negotiations, nor reading the agreement's release language.

In mid-July or late June of 2021, McNaughton applied for a teaching position at the School District of Federick in anticipation of being medically cleared to return for work. McNaughton was employed as a fourth and fifth grade teacher by that school district for

the 2021-2022 and 2022-2023 school years, and he intends to continue working for that school district.

OPINION

Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If there is any genuine issue as to any material fact, the court cannot grant summary judgment. *Id*. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). Finally, "[t]he evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id*. at 255. The District seeks summary judgment on all of McNaughton's claims, based first on the affirmative defense of release and on the merits of his FMLA, HIPAA and ADA claims. Although the District's arguments about release are a close call, there are material disputes of fact that make summary judgment improper as to this affirmative defense. Because McNaughton's FMLA, HIPAA and ADA claims clearly fail on the merits, the court focuses its analysis on those arguments alone.

I.   **FMLA Interference**

The central provision of the FMLA guarantees eligible employees twelve weeks of leave in a one-year period for certain enumerated reasons, including for a serious health condition that makes him unable to perform her job. 29 U.S.C. § 2612(a)(1). To prevail on an FMLA interference claim, a plaintiff must prove that: "(1) [he] was eligible for the

11

FMLA's protections; (2) [his] employer was covered by the FMLA; (3) [he] was entitled to take leave under the FMLA; (4) [he] provided sufficient notice of [his] intent to take leave; and (5) [his] employer denied [him] FMLA benefits to which [he] was entitled." *Goelzer v. Sheboygan Cnty.*, 604 F.3d 987, 993 (7th Cir. 2010).

McNaughton's claim fails at the first element. As noted above, to be eligible for FMLA, the employee must have been employed by the employer for at least 12 months and have worked at least 1,200 hours during the 12-month period of time before the leave. *See* 29 U.S.C. § 2611(2)(a). There is no dispute that McNaughton had not been employed by the District for at least 12 months by February of 2021; to the contrary, his employment had started just over three months earlier, at the end of August 2020. Because he was not eligible for FMLA protections, his FMLA claim fails as a matter of law.

## II. HIPAA and HIPAA Retaliation

Next the District seeks summary judgment on McNaughton's claim that it retaliated against him for asserting his rights under HIPAA by refusing to provide the District access to his records. However, "HIPAA does not furnish a private right of action." *See Carpenter v. Phillips*, 419 F. App'x 658, 659 (7th Cir. 2011); *see also Kreger-Mueller v. City of Middleton Police Dep't*, No. 18-cv-708-jdp, 2018 WL 6421069, at *5 (W.D. Wis. Dec. 6, 2018) ("[A]n individual person cannot sue to enforce [his] rights under HIPAA because HIPAA does not create a private right of action to sue in federal court."). Therefore, any HIPAA-based claim that McNaughton intends to bring in this lawsuit fails because it is not cognizable in a civil action.

## III. ADA

Under the ADA, employers are prohibited from discriminating "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). While McNaughton contends that the District violated the ADA by failing to provide him a reasonable accommodation for disability, the District seeks summary judgment on the grounds that: McNaughton was not a qualified individual with a disability; the District did not know he had a disability; McNaughton failed to engage in the interactive process to arrive at an appropriate accommodation; *and* there was no reasonable accommodation to allow him to perform the essential functions of the job. The court need only address the first and last arguments to find in the District's favor.

To be a "qualified individual," an employee must "satisf[y] the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc."; [and] if he does, he must [also] be able to "perform the essential functions of the position . . . with or without reasonable accommodation" at the time he resigned. *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 285, 287 (7th Cir. 2015); *see also Whitaker v. Wis. Dept. of Health Servs.*, 849 F.3d 681, 684 (7th Cir. 2017) (explaining that an "otherwise qualified" employee is one who "is capable of performing the 'essential functions' of the job with or without a reasonable accommodation").

From the record, a reasonable jury would have to find that McNaughton was not able to perform the essential functions of his job, even before he left the school for medical reasons on February 8. To begin, there is no dispute that McNaughton was having substantive performance issues even in the fall of 2020, which he acknowledged during his

13

September 2020 performance review, when he conceded that he needed to improve in several substantive areas. Even after Schock informed McNaughton that what she observed in his classroom between November 5 and 9 was unacceptable, McNaughton's lessons were still deficient, his room was still disorganized, his grades still had not been entered and he still did not complete remote learning training.

Although the evidence of his performance problem, alone, does not necessarily establish that he could not perform the necessary functions of his job without an accommodation, his extended absence, without any indication of when he might return, does. The "[i]nability to work for a multi-month period removes a person from the class protected by the ADA." *McAllister v. Innovation Ventures, LLC*, 938 F.3d 963, 967 (7th Cir. 2020) (citing *Bryne v. Avon Prod., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003). For example, in *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 479 (7th Cir. 2017), the Seventh Circuit held that a long-term leave of absence was not a reasonable accommodation under the ADA because "an extended leave of absence does not give a disabled individual the means to work; it excuses his not working." *Id.* at 481.

McNaughton neither responds to this argument nor suggests that he was able to work at any time between February 8, 2021, and his April 2021 resignation. Instead, he focuses his opposition arguments on the District's knowledge of his condition and his belief that it failed to engage in the interactive process to reach a reasonable accommodation. But McNaughton still needs to submit evidence that he was qualified to teach, and no evidence suggests that when his employment ended in April of 2021, he was physically capable of working again in his same role at the school and meet the performance

expectations to which he had previously struggled. To the contrary, the most recent notice McNaughton provided the District in March of 2021 stated that there was *no* indication he could return to teach, nor even that his condition had improved. Therefore, the District is entitled to summary judgment on McNaughton's ADA claim because he was unable to work *and* there was no indication that that might change.

Although the court need not address the District's additional arguments, it is also entitled to summary judgment for a related reason: McNaughton cannot show that a reasonable accommodation for his cognitive decline was available. To begin, McNaughton carries the burden to show that "a reasonable accommodation was possible and the [School District] did not offer it," *Sansone v. Brennan*, 917 F.3d 975, 979-80 (7th Cir. 2019), and he has not identified a reasonable accommodation for his cognitive decline, certainly nothing that would have allowed him to continue teaching at any point through his April 2021 resignation. McNaughton suggests in his opposition brief that he requested to keep an emergency supply of ADHD medication at the school, and that request was denied. (Dkt. #21 at 3.) However, there is no evidence from which a reasonable trier of fact could find that access to his ADHD medication would have somehow prevented McNaughton's cognitive decline or materially reduced his need to take several months of leave without any indication of when he might return. Regardless, absent some showing from which a reasonable jury could find that there was an accommodation allowing McNaughton to continue teaching, his ADA reasonable accommodation claim fails on its face as well.

### IV. Constructive Discharge

Finally, the District seeks summary judgment on McNaughton's claim that he was constructively discharged after he disclosed his disabilities. The court will assume for purposes of this motion that a constructive discharge claim is available under the ADA in the context of a hostile work environment. *See EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432 (7th Cir. 2000). The Seventh Circuit analyzes ADA constructive discharge claims under the same standards governing such claims under Title VII. *Miranda v. Wis. Power & Light Co.*, 91 F.3d 1022, 1017 (7th Cir. 1996) (citing *DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797 (7th Cir. 1995)). A constructive discharge occurs only when the plaintiff can show that his working conditions had become so intolerable that he was forced to resign. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004). The Seventh Circuit has recognized two forms of constructive discharge: (1) when a plaintiff resigns due to alleged discriminatory harassment; and (2) when an employer "acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns[.]" *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679–80 (7th Cir. 2010) (quoting *E.E.O.C. v. Univ. of Chicago Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002)). McNaughton does not begin to show either form is present here.

Under either form, constructive discharge requires proof that the plaintiff's "working conditions [were] even more egregious than that required for a hostile work environment claim, because employees are generally expected to remain employed while seeking redress, thereby allowing an employer to address a situation before it causes the employee to quit." *Chapin*, 621 F.3d at 679 (citation omitted). Examples of "egregious"

16

working conditions that go beyond a hostile working environment and result in constructive discharge frequently include threats to personal safety. *Id.* at 679 (citing *Porter v. Erie Foods, Int'l, Inc.*, 576 F.3d 629, 640 (7th Cir. 2009) (claim for constructive discharge possible where harassment included repeated use of noose and implied threats of physical violence)); *Taylor v. W & S Life Ins. Co.*, 966 F.2d 1188, 1198–99 (7th Cir. 1992) (constructive discharge where supervisor made racial jokes and brandished a firearm, held it to the plaintiff's head, then took a photo and made racial jokes about it at a staff meeting).

At most, McNaughton maintains that he was forced to resign because, after he disclosed his disability, he was placed on a performance improvement plan, and Schock then scrutinized his work performance, rather than providing him a reasonable accommodation. However, while Schock criticized McNaughton's work performance, her comments were neither rude nor insulting; instead, a reasonable jury would be compelled to find her critiques were directly related to his work performance issues and provided clear, reasonable bench marks for improvement. Even if a jury could infer her feedback was communicated in an unpleasant or possibly insensitive manner, which is a stretch, her comments were almost universally specific to McNaughton's actual performance, substantive *and* constructive; and none were remotely egregious enough to amount to, much less surpass, the types of comments that could constitute a hostile work environment.

In addition, Principal Schock's critical comments occurred in October and November of 2020, but McNaughton did not actually resign until April of 2020, without any more interactions with Schock about his work performance. Rather, the only

17

communications that occurred while he was on leave were attempts to learn more about his condition.  Moreover, nothing in the record suggests that any other District representative acted to harass or even be unpleasant, in their interactions with McNaughton during that two-month period.  *See Miranda*, 91 F.3d at 1017 (constructive discharge claim could not be sustained by evidence that supervisor inquired into "the status of her condition, the prospects for improvement, and any modifications in her employment duties necessitated by her condition").

McNaughton does not otherwise argue that a reasonable person in his position would have believed they had no choice but to resign, nor does the record support such a finding by a reasonable jury.  It is undisputed that *before resigning* McNaughton was extended an opportunity to attend a private conference with the school board after he received his notice of non-renewal.  However, he declined to attend the conference, and instead hired an attorney who negotiated the terms of his resignation.  Although his resignation was certainly one of his options -- indeed, the one suggested by Administrator Doerfler during their April 13 conversation -- there is no dispute that McNaughton could have challenged the non-renewal despite Dr. Doerfler's suggestion.  In fact, McNaughton has not suggested that he felt unable to attend the conference to challenge his possible non-renewal.

More importantly, even if McNaughton could show that a reasonable employee in his position felt he had no other choice but to resign, the District's decision was not based on McNaughton's disability.  Rather, there is no reasonable dispute that: (1) there was an overage of staff that warranted a non-renewal, and (2) McNaughton was unable to perform

his job duties at that time because he was unable to be physically present for instruction. Therefore, McNaughton's constructive discharge claim fails as a matter of law.

ORDER

IT IS ORDERED that:

1. Defendant's motion for summary judgment (dkt. #12) is GRANTED.

2. The clerk of court is directed to enter judgment accordingly and close this case.

Entered this 5th day of September, 2023.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge